UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
                              :
WINTHROP HOUSE ASSOCIATION,    :
INC.                          :
                              :
v.                            :   CIV. NO. 3:00CV328 (AHN)
                              :
BROOKSIDE ELM ASSOCIATES       :
LIMITED PARTNERSHIP, ET AL     :
                              :
                              :
```
_____ OPINION

This matter was referred for decision on the following question:

> Did the Declarant properly exclude the
> implied warranties and/or express warranties?

I.  PROCEDURAL BACKGROUND

On February 18, 2000, Winthrop House Association, Inc. (the "Association") filed an action against Brookside Elm Associates Limited Partnership; Collins Properties, LLC; Collins Enterprises, LLC; and Arthur Collins, II (referred to collectively as "the defendants"),[1] arising from the conversion of a six story apartment building located in Greenwich, Connecticut, into a condominium complex.  Plaintiff alleges

_____

[1] Defendant Preiss Breismeister Architects, P.C. notified the Court, by letter dated August 7, 2001, that it did not intend to file a brief on this question, stating in part that it believed that this question did "not concern the conduct of Preiss Breismeister." [Doc. #31, under seal].  Preiss Breismeister reserved the right to file a reply brief "in the event that plaintiff or any other party does in fact allege liability on the part of Preiss Breismeister with respect to the issues presented." Id.  No reply brief was filed by Preiss Breismeister.

construction defects and/or code violations and seeks damages. The parties agreed to submit the matter to mediation, and on May 20 and 21, 2001, the parties met with a mediator, Attorney Robert Rubin, for the purposes of touring Winthrop House and mediating the issues raised by the Association in its Amended Complaint.

During the course of the mediation it became apparent to the mediator and the parties that advice on issues relating to the exclusion of various alleged warranties would be instructive to move mediation forward.  This matter was referred for an "advisory opinion" on June 27, 2001.  This is not an advisory opinion.  Church of Scientology of California v. United States, 506 U.S. 9, 12 (1992)  ("It has long been settled that a federal court has no authority to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it."); Barr v. Matteo, 355 U.S. 171, 172 (1957) ("[A]n advisory opinion cannot be extracted from a federal court by agreement of the parties.").  Rather, the parties have submitted this question of law for decision with the belief that the decision may facilitate the mediation of their dispute.

The parties filed their position papers under seal on August 7, 2001. [Doc. ##33, 34, 35, 36].  Reply briefs were filed on September 18, 2001. [Doc. ##37, 38].  Oral argument was held on February 6, 2003.  Leave to file supplemental motions was granted on March 12, 2003 [Doc. #46].  The parties submitted their supplemental briefing on March 28 and April 17, 2003. [Doc. ##49,

50].

     II.  <u>FACTUAL BACKGROUND</u>[2]

The Winthrop House opened in 1938 as an apartment building at 25 West Elm Street in downtown Greenwich, Connecticut.  The building originally housed fifty-three apartments on six floors.

In 1993, Brookside Elm purchased Winthrop House, intending to convert it to a condominium and perform certain renovations. Renovations began on the building in 1994, with most work completed by 1997.  Winthrop House now consists of forty-eight individual residential units, as several apartments were combined to make larger units during the renovations.

Brookside Elm is the Declarant.  Collins Properties was the Management Company for the condominium.  Collins Enterprises was the original construction manager for the Winthrop House renovations. However, when the scope of planned work increased, Collins Enterprises turned over specific responsibilities as general contractor to Wernert Associates, Inc.

     <u>Plaintiff's Master Punch List</u>

Exhibit BB to plaintiff's Amended Complaint, entitled "Master Punch List Memorandum," dated April 17, 2000, lists over thirty-nine categories of alleged defects or problems with the following systems or components including, but not limited to:

--------

[2]The following facts are provided as background and are undisputed for purposes of this opinion.

3

> The exterior facade including lintels,
> balconies, windows, window caulking and trim,
> brickwork and the chimney; roof; HVAC system;
> elevator; plumbing and electrical; water
> damage; code violations & safety omissions;
> fire doors, fire extinguishers, fire pump
> system/sprinkler; carbon monoxide gas
> systems; emergency phone; PTAC pipes and
> valves; water tanks; pump systems; drainage
> systems; and dryer vents.

[Compl. Ex. BB]. The Master Punch List also includes actual
Association costs to date and estimated Association costs to
repair for each category.  The Master Punch List was prepared by
counsel to summarize its experts' findings of alleged defects to
the property.   Actual repair cost to the Association as of April
2000 was $153,169. The Association's estimated cost to repair 8
of the 39 categories totaled $955,932. The Association provided
no estimate to repair the other 31 categories.[3]


    Town of Greenwich Permits/Code Compliance

     The Town of Greenwich Building Department issued more than
54 permits for the repair and renovation work.  Permits were
pulled and certificates of occupancy were issued on a unit-by-
unit basis, including buyer generated customizing changes, as
well as for common areas, exteriors, and site improvements.  The
Building Department has not cited the defendants for any

---

[3]For purposes of this ruling, the Court has not considered
the expert reports plaintiff appended to its complaint and has
not considered the alleged deficiencies.  The Court notes that
the Master Punch List was created in April 2000, nearly four and
a half years after the first units were sold.

unremediated code violations and has issued certificates of
occupancy. [Doc. #34 at 4-5; Def. Ex. E].

The boilers and the elevators were inspected and passed by
the State of Connecticut authorities. [Def. Ex. B].  The Deputy
Fire Marshal confirmed compliance with the Connecticut Fire
Safety Code. [Def. Ex. C].


<u>The Public Offering Statement</u>

Pursuant to the Connecticut Common Interest Ownership Act,
Conn. Gen. Stat. §§47-200 <u>et seq</u>. ("CIOA"), Brookside Elm, as
Declarant, prepared a Public Offering Statement (the "POS") in
April 1995 for the purpose of submitting Winthrop House as a
condominium.  Each prospective purchaser of a unit was provided
with a copy of the POS.  The following provisions were designated
by the parties as relevant to the present matter.

Paragraph 2(c) of the POS provides:

> (c) <u>Rehabilitation Work</u>: The buildings are
> currently being operated as residential
> apartment buildings.  The Declarant will
> undertake repair and rehabilitation work with
> respect to all Units except those whose
> present tenants-in-possession have a
> statutory right to remain in their Units as
> tenants and any Unit purchased by a present
> tenant-in-possession who requests that repair
> and rehabilitation work not be done in his
> Unit.  Such repair and rehabilitation work
> may include the renovation of kitchens, the
> upgrading of electrical systems, the
> upgrading of some plumbing systems, and the
> painting of Units.  It is also possible that
> fireplaces will be added to one or more
> Units.  The Declarant has also begun to have
> repaired and rehabilitated portions of the
> Common Elements including the painting of
> hallways, the reconstruction of the front

entrance, the repainting and recaulking of windows, and the reconstruction of the building parapet. **All repair and rehabilitation work will be done at the sole discretion of the Declarant. The Declarant makes no representation as to the specific repair and rehabilitation work to be done or as to the date of completion of any such work.** Rehabilitation work on common areas has commenced. Individual Units will be repaired and rehabilitated as they are vacated by current tenants. The Declarant discloses that there is no schedule of such rehabilitation.

[Def. Ex. A, POS ¶2(c) (emphasis added)].

Paragraphs 10A.1, 10A.2, and 10A.3 describe the creation of express warranties of quality, implied warranties of quality, and exclusion or modification of implied warranties of quality pursuant to CIOA, Conn. Gen. Stat. §§47-274, 47-275, and 47-276, respectively. [Def. Ex. A, POS ¶¶10A.1, 10A.2 and 10A.3].

Paragraph 10A.3 of the POS states,

Section 47-276. Exclusion or Modification of Implied Warranties of Quality.

(a) Except as limited by subsection (b) of this section with respect to a purchaser of a unit that may be used for residential use, implied warranties of quality:  (1) May be excluded or modified by agreement of the parties;  and (2) are excluded by expression of disclaimer, such as "as is", "with all faults", or other language that in common understanding calls the purchaser's attention to the exclusion of warranties.

(b) With respect to a purchaser of a unit that may be occupied for residential use, no general disclaimer of implied warranties of quality is effective, but a declarant may disclaim liability in an instrument signed by the purchaser for a specified defect or class of defects or specified failure to comply with applicable law, if the defect or failure entered into and became a part of the basis

6

of the bargain.

Similarly, paragraph 10B creates express and implied warranties under the New Homes Warranties Act (NHWA), Conn. Gen. Stat. §§47-116 ,"Definitions"; 47-117, "Express Warranties"; 47-118, "Implied Warranties"; 47-119, "Vendor Not to Evade by Intermediate Transfer"; and 47-120, "Warranties Created by Chapter 827 Additional to Any Other Warranties."

Section 47-118 of the NHWA states,

Implied warranties

(a) In every sale of an improvement by a vendor to a purchaser, except as provided in subsection (b) of this section or excluded or modified pursuant to subsection (d), warranties are implied that the improvement is: (1) Free from faulty materials; (2) constructed according to sound engineering standards; (3) constructed in a workman-like manner, and (4) fit for habitation, at the time of the delivery of the deed to a completed improvement, or at the time of completion of an improvement not completed when the deed is delivered.

(b) The implied warranties of subsection (a) of this section shall not apply to any condition that an inspection of the premises would reveal to a reasonably diligent purchaser at the time the contract is signed.

(c) If the purchaser, expressly or by implication, makes known to the vendor the particular purpose for which the improvement is required, and it appears that the purchaser relies on the vendor's skill and judgment, there is an implied warranty that the improvement is reasonably fit for the purpose.

(d) Neither words in the contract of sale, nor the deed, nor merger of the contract of sale into the deed is effective to exclude or modify any implied warranty; provided, if

7

the contract of sale pertains to an improvement then completed, an implied warranty may be excluded or modified wholly or partially by a written instrument, signed by the purchaser, setting forth in detail the warranty to be excluded or modified, the consent of the purchaser to exclusion or modification, and the terms of the new agreement with respect to it.

(e) The implied warranties created in this section shall terminate:  (1) In the case of an improvement completed at the time of the delivery of the deed to the purchaser, one year after the delivery or one year after the taking of possession by the purchaser, whichever occurs first;  and (2) in the case of an improvement not completed at the time of delivery of the deed to the purchaser, one year after the date of the completion or one year after taking of possession by the purchaser, whichever occurs first.

Paragraph 10B also sets forth the limitations on warranties which are part of each purchase agreement.  The Limitations of Warranties section is set forth in large, upper case type as follows:

<u>LIMITATIONS ON WARRANTIES</u>

PURSUANT TO SECTIONS 47-276(b) AND 47-118(d) OF THE CONNECTICUT GENERAL STATUTES, THE DECLARANT WILL INCLUDE IN ITS PURCHASE AGREEMENT THE FOLLOWING PARAGRAPHS WHICH PROVIDE THAT CERTAIN OF THE WARRANTIES DESCRIBED ABOVE ARE EXCLUDED:

1.  THE IMPLIED WARRANTIES OF SECTIONS 47-275(b) AND 47-118(A) THAT THE IMPROVEMENTS ARE: (1) FREE FROM FAULTY AND/OR DEFECTIVE MATERIALS, (2) CONSTRUCTED IN ACCORDANCE WITH APPLICABLE LAW AND ACCORDING TO SOUND ENGINEERING AND CONSTRUCTION STANDARDS, (3) CONSTRUCTED IN A WORKMANLIKE MANNER, AND (4) FIT FOR HABITATION ARE EXCLUDED TO THE EXTENT THE IMPROVEMENTS ARE COMPLETED AS OF THE DATE OF THE PURCHASE AGREEMENT.  SPECIFICALLY, THE DECLARANT MAKES NO REPRESENTATION OR WARRANTY WHATSOEVER WITH RESPECT TO ANY STRUCTURAL COMPONENT OF THE BUILDING; THE EXTERIOR

FACADE OF THE BUILDING; THE ROOF; THE BOILERS
OR ANY OTHER PART OF THE HEATING SYSTEM; THE
ELECTRICAL SYSTEM, THE HOT WATER SYSTEM, OR
THE PLUMBING SYSTEM OR ANY PART OF ANY SUCH
SYSTEMS; OR WITH RESPECT TO ANY KITCHEN
CABINETS, CARPETING, TILING, WALLPAPER, PAINT
OR OTHER SURFACE FINISHINGS OF ANY KIND,
WOODWORK, BATHROOM FIXTURES, OR UTILITY
FIXTURES OR OUTLETS.

2.    THE DECLARANT MAKES NO WARRANTIES AS TO
THE CONDITION OF ANY HOT WATER HEATER, AIR
CONDITIONER, KITCHEN EQUIPMENT OR APPLIANCES
OR OTHER ITEMS CONSIDERED CONSUMER PRODUCTS
UNDER THE MAGNUSEN-MOSS FEDERAL TRADE
COMMISSION ACT.   THE DECLARANT WILL DELIVER
TO BUYER ANY MANUFACTURER'S WARRANTIES THAT
ARE BOTH APPLICABLE TO SUCH EQUIPMENT OR
APPLIANCES AND FOR THE SOLE BENEFIT OF THE
CONSUMER PURCHASER.   IMPROVEMENTS AND
APPLIANCES INSTALLED BY DECLARANT AT A
PURCHASER'S REQUEST AND EXPENSE, IF ANY,
SHALL BE COVERED BY THE MANUFACTURER'S OR
CONTRACTOR'S WARRANTY, IF ANY.

3.    THE DECLARANT MAKES NO REPRESENTATIONS OR
WARRANTIES AS TO THE CONDITION OR HEALTH OF
ANY SHRUBS, TREES OR PLANTINGS LOCATED ON THE
AREAS SURROUNDING THE BUILDINGS.   THE
DECLARANT WILL DELIVER TO THE ASSOCIATION ANY
NURSERY'S WARRANTIES THAT ARE BOTH APPLICABLE
TO SUCH VEGETATION AND FOR THE SOLE BENEFIT
OF THE CONDOMINIUM ASSOCIATION.

4.    THE PURCHASER ACKNOWLEDGES BY SIGNING
THIS PURCHASE AGREEMENT THAT THE PURCHASER
AGREES TO AND UNDERSTANDS THE AGREED TO AS
PART OF THE BASIS OF THE PURCHASER'S BARGAIN
IN PURCHASING THE UNIT.

NO ADDITIONAL EXPRESS OR IMPLIED WARRANTIES,
UNLESS REQUIRED BY LAW, ARE MADE BY THE
DECLARANT.

[Def. Ex. A, POS ¶10B].

Paragraph 19(a) of the POS provides that:

(a) The Declarant plans to repair and
rehabilitate most of the units. **However, the
Declarant has reserved the right, in its sole
discretion, to convey a Unit on an "as is"**

> **basis,** except for a legally required
> electrical upgrade, to purchasers bargaining
> for such a conveyance if (1) the present
> tenant in possession elects to purchase his
> Unit and requests such an arrangement, or (2)
> the present tenant in possession has a
> statutory right to remain in possession as a
> tenant.

[Def. Ex. A, POS ¶19(a), (emphasis added)].

Exhibit G to the POS consists of a document entitled "Architect/Engineering Survey," dated October 1994, prepared by Preiss Breismeister P.C. Architects.  Exhibit G describes the then-current condition of 38 various building components and their replacement costs.  Many of the building components were described as being in poor condition, and the survey notes that, for many components, their condition varied.  Preiss Breismeister opined the cost of replacement to be $7,390,500. The Architects noted that the "report [was] based upon observations of the visible and apparent condition of the building and its major components on the date of inspection."  They further warned that, "[t]here may be other hidden or partially hidden problems with the building structure and/or systems." [Def. Ex. A, POS-Ex.G].

Every prospective purchaser of a unit signed a document acknowledging that he or she reviewed and agreed to the terms of the POS. [Doc. #34 at 10].

The Limited Warranty Administration Program

Exhibit L to the Connecticut POS and the New York Supplement is entitled "Limited Warranty Administration Program for Winthrop House."  The Administration Program consists of four Warranty

10

Work Request Forms, to be submitted by the buyer of a unit to Brookside Elm at closing, 14 days after closing, 60 days after closing and 1 year after closing. The forms reiterate that the buyer, by signing, accepts the warranty terms described in the POS and Purchase Agreement.[4] Each buyer was given the opportunity to list any items for which the buyer was requesting repair or completion. [POS Ex. L].

        The New York Supplement

        Pursuant to New York law, prospective purchasers residing in New York State were provided both the Connecticut POS and a New York Supplement (the "Supplement"), which together comprise the Offering Plan.[5]

_____

[4]Each Warranty Work Request Form states,

        Pursuant to the Warranty Program described in our Purchase Agreement and the Public Offering Statement, the terms of which (I) (We) hereby accept and agree to, (I) (We) request completion or repair of the following warranty items, without limiting our rights to submit subsequent requests under the Warranty Program.

[Def. Ex. L to POS].

[5]The cover page of the Supplement states in capital letters,

        THIS IS A SUPPLEMENT TO AND IS ONLY TO BE USED IN CONJUNCTION WITH THE PUBLIC OFFERING STATEMENT FOR WINTHROP HOUSE, GREENWICH, CONNECTICUT. PURCHASERS WITH REGARD TO WHOM THIS OFFERING IS MADE IN OR FROM THE STATE OF NEW YORK MUST RECEIVE BOTH THE PUBLIC OFFERING STATEMENT AND THIS SUPPLEMENT.

[Def. Ex. D].

11

Part I(A) entitled "Special Risks," paragraph 4, states,

> 4. The Declarant plans to repair and rehabilitate most of the units. **However, the Declarant has reserved the right to convey units on an as-is basis** except for a legally required electrical upgrade (100 amp service to each unit), to purchasers bargaining for such a conveyance if (a) the present tenant in possession elects to purchase his unit as is and requests such an arrangement, or (b) the present tenant in possession has a statutory right to remain in possession as a tenant. Existing tenants have certain rights to purchase, or continue to lease, their respective units under Connecticut law (See Section F-Rights of Existing Tenants).
>
> The Declarant will undertake repair and rehabilitation work with respect to all units except as set forth above. Such repair and rehabilitation work may include the renovation of the kitchen, the upgrading of electrical systems, the upgrading of some plumbing systems, and the painting of units. It is also possible that fireplaces will be added to one or more of the units. In addition, the Declarant has also begun to have repaired and rehabilitated portions of the common elements. **All repair and rehabilitation will be done at the sole discretion of the Declarant. The Declarant makes no representation as to the specific repair and rehabilitation work to be done or as to the date of the completion of any such work.** Rehabilitation work on common areas has commenced. Individual units will be repaired and rehabilitated as they are vacated by current tenants or when under contract at the Declarant's option. The Declarant discloses that there is no schedule of such rehabilitation work. Because not all such repair and renovation work shall be completed prior to the conveyance of units, such work may create an inconvenience to unit purchasers who purchase prior to the completion of such work.

(Emphasis added).

Paragraph 13 of the Supplement states,

13.  The Declarant is performing the
rehabilitation work on the condominium with
the proceeds of a mortgage loan from The Hong
Kong and Shanghai Banking Corporation
Limited, New York branch.  No assurances are
given that these proceeds shall be sufficient
to complete all contemplated rehabilitation
work or that the proceeds will be fully
advanced.  In the event that the Declarant
defaults pursuant to such mortgage, the
mortgagee is not obligated to complete any
such work.

The Supplement further states, at page 8, that it "is not
directed to, nor shall it create, any rights in or obligations to
any other person other than a New York purchaser."

Section F to the Supplement, "Rights of Existing Tenants,"
states in part,

The Declarant plans to repair and
rehabilitate **most of** the units.  However, the
Declarant has reserved the right to convey
one or more units on an **"as is" basis** except
for a legally required electrical upgrade
(100 amp service to each unit), to purchasers
bargaining for such a conveyance if (1) the
present tenant in possession elects to
purchase his unit as is and requests such an
arrangement, or (2) the present tenant in
possession has a statutory right to remain in
possession as a tenant under Connecticut law.

(Emphasis added).

Section X to the Supplement, "Sponsor's Statement of
Building Condition," states,

The Declarant has no knowledge of any
material defect or need for major repairs to
the Condominium except as set forth in the
description of property and building
condition included in Part II of this
Supplement.  The rehabilitation work to be
completed by the Declarant may include the
renovation of the kitchens, the upgrading of
electrical systems, the upgrading of some

13

plumbing systems, and the painting of Units.
It is also possible that fireplaces will be
added to one (1) or more Units.  The
Declarant will also repair and rehabilitate
portions of the common elements, including
the painting of hallways, the reconstruction
of the front entrance, the repainting and
recaulking of windows, and the reconstruction
of the building parapet. **All repair and
rehabilitation work will be done at the sole
discretion of the Declarant, and the
Declarant makes no representation as to the
specific repair and rehabilitation work to be
done or as to the date of completion of any
such work,** but it is anticipated that the
repair and rehabilitation work to be done
with respect to the common elements will be
competed within approximately one (1) year of
the date of this Supplement.  There are
presently not [sic] certificates of occupancy
for the building comprising the Condominium
or the individual Units, because the building
predates the requirement for certificates of
occupancy.

[emphasis added].

### Preiss Breismeister Letter

Attached to the revised survey is an unsigned memorandum on

Preiss Breismeister letterhead, dated November 14, 1995, and

addressed "to whom it may concern." [Pl. Ex. F]. The memorandum

lists 11 areas of improvements the writer indicated would be

made.

In the Architect's Certificate signed by Frederick Preiss on

behalf of Preiss Breismeister on December 27, 1995, the architect

emphasized that the survey and revised survey were based on

visual inspections only, stating, "it is to be understood that

all aspects of the physical condition of the property cannot be

determined by a visual inspection and that all statements

14

contained in the certification are premised on and limited to
such visual inspection." [Def. Ex. D, Supplement, §AF, (viii)
"Certificate"].

The New York Supplement was amended twice.  Both Amendments
are labeled "First Amendment." The May 2 Amendment corrected
certain internal references to sections and pages, added some
information regarding payment of deposits and attached a new form
Purchase Agreement.  The December 31 Amendment attached another
new form Purchase Agreement, which superseded the form attached
to the May 2 Amendment.


Architect/Engineering Survey

Part II of the N.Y. Supplement, referenced in Section X
quoted above, contains both the Architect/Engineering Survey,
dated October 1994, at Exhibit G, and the Architect/Engineering
Report dated October 1994, revised November 14, 1995, at Section
AC.  The October 1994 Architect/Engineering Survey is located at
Exhibit G to the POS.

Both the revised survey and the original survey, which are
identical, list the condition of various building components.
However, the revised survey includes some additional notes.  One
note indicates that some units show leakage at window sills and
jams, and there is evidence of older leaks at the ceiling, which
the architect assumed were inactive. [Def. Ex. D, Supplement,
§AC, "Units, General"].  Active water leaks and water damage were
observed in the basement.  [Def. Ex. D, Supplement, §AC,

"Basement, General"]. The roof was found to be in poor condition generally. [Def. Ex. D, Supplement, §AC, "Roof, General"].

The remaining notes in the revised survey are identical to the notes in the original survey, with the exception of some additional information regarding lot line windows, installation of a new boiler, an elevator inspection, and boiler inspection.

The revised report, like the original report, was based on a visual survey of the building only, and indicated that there might be hidden or partially hidden problems with the building structure or systems. [Def. Ex. D, Supplement, §AC, "Please Note"].

Purchase Agreements

The purchase agreement provided that the buyer accepted those portions of the unit, common elements, and limited common elements that had already been completed "as is," in their existing condition subject to normal wear and tear. [Def. Ex. D, part II, §Y, ¶12 "Limited Warranties"].

According to the purchase agreement, the only warranties are those described and limited in the Limited Warranty Administration Program set forth in the POS. Id.

> All implied warranties are hereby disclaimed
> and excluded with respect to defects which
> exceed the specific standards of the Limited
> Warranty Administration Program, (the
> "Warranty Standards"), and Buyer consents to
> the exclusion of implied warranties exceeding
> said specific standards from whatever source.
> Buyer agrees that the price paid contemplates
> this exclusion.

16

Id.

The purchase agreement incorporates the POS by reference and makes it a part of the agreement. [Def. Ex. D. Part II, §Y, ¶1 "Unit"]. Throughout the purchase agreement, reference is made to the terms and conditions of the POS, id. ¶¶3, 12, 20, 22, 26. By signing the purchase agreement, buyers acknowledged that they received and accepted the terms of the POS. Id. ¶¶24, 27.

A "Winthrop House New York Rider to Purchase Agreement" was incorporated into the purchase agreements for New York residents only, pursuant to New York General Business Law. [Def. Ex. D, Part II, §Y, at 14, "Winthrop House New York Rider to Purchase Agreement"]. Paragraph 1 of the New York Rider states, in relevant part,

> Prior to my execution of the Purchase Agreement and this New York Rider to it, I have been presented with both the Public Offering Statement for Winthrop House and the New York Supplement. I understand that together the Public Offering Statement and the New York Supplement are referred to as the "Offering Plan". I understand that the documents comprising the Offering Plan, including all exhibits and schedules, are incorporated in this Purchase Agreement by Reference and are made a part of this Purchase Agreement with the same force and effect as if fully set forth herein. **In the event of any inconsistency between the terms of this Purchase Agreement and the terms of the Offering Plan, the terms of the Offering Plan shall govern.**

[Id. at 14 (emphasis added)].

The Sorrow Rider II

On or about April 23, 1996, Jerry W. Sorrow and Pamela B. Sorrow entered into a Purchase Agreement for Winthrop House Unit No. 55. [Amend. Compl. Ex. QQ].  Attached to the Sorrow Purchase Agreement are two undated documents, labeled "Rider" and "Rider II."  "Rider" consists primarily of a list of finishes for the unit and work to be completed, identified as A-H.  "Rider II" contains 9 numbered paragraphs.  Plaintiff argues that the Sorrow Rider II created "unconditional" express warranties and relies on its paragraphs 1, 3, 4 and 7(a),(b),(e) and (h).  [Doc. #33 at 18-19].

The Sorrow Rider II states in its introduction,

> This Rider is attached to an Agreement between BROOKSIDE ELM ASSOCIATES LIMITED PARTNERSHIP, Seller and JERRY W. SORROW and PAMELA B. SORROW, Purchaser and is incorporated into said Agreement as if set forth therein.  In the event that there is a conflict between the terms of the Agreement and the terms of the Rider, the terms of the Rider shall control:

Plaintiff relies on the following language contained in the Sorrow Rider II.

Paragraph 1,

> Seller represents that at the time of delivery of the deed and possession, there shall exist no violations of governmental (including zoning and planning rules), regulations or limitations . . . .
> In addition, Seller represents that all construction on and improvement to said property has been in accordance with applicable zoning ordinances and building codes of the Town or City where the premises are located and State of Connecticut . . . .

18

Paragraph 3 states,

> Seller expressly guarantees the Unit
> renovations constructed or to be constructed
> on said premises together with the fixtures
> and systems located thereon against defects
> in workmanship and material for a period of
> one (1) year from the date of the delivery of
> the deed, reasonable wear and tear excepted.
> Seller further warrants that the Building and
> Unit and all renovations and improvements
> constructed or to be constructed on the
> premises were constructed in a workmanlike
> manner and that all materials and fixtures
> used in the construction (or to be used) were
> (or will be) of new and marketable quality.

Paragraph 4 states,

> In the event of a material defect in the
> renovation of the Building and the Unit
> performed by Seller, its systems or fixtures,
> Purchaser shall give notice to Seller and
> Seller shall remedy such defect at Seller's
> expense and to Purchaser's reasonable
> satisfaction within a reasonable period of
> time following such notification, subject to
> the warranty provision in the Public Offering
> Statement as may be modified by Rider
> Paragraph 7 below.

Plaintiff relies on the following subsections of paragraph 7,

> The seller hereby represents, warrants and
> guaranties, which representations warranties
> and guaranties shall survive the Closing, as
> follows:
>
> (a) the roof of the building shall be
> replaced by a reputable professional roofing
> company, which company shall (i) use top
> quality materials, (ii) complete such repair
> and replacement in a good and workmanlike
> manner and (ii) provide a warranty for a term
> of not less than 10 years, which warranty
> shall be for labor and materials, and shall
> run to the Association.
>
> (b) the exterior of the building has been
> repointed and repaired where needed in a good
> and workmanlike manner so as to prohibit

19

seepage into the building as described in the
Public Offering Statement; any warranty for
such repointing and repair shall run to the
Association.

(d) the elevator will be repaired to insure
accurate leveling at each floor and smooth
ride on or before issuance of the final
Certificate of Occupancy for the Building,
and all such repair work shall be completed
in a good and workmanlike manner; the
requisite inspection of such elevator is
current and the elevator otherwise has passed
inspection by the engineer.

(e) all repairs recommended in the Public
Offering Statement relating to the central
boiler and heating system have been completed
and any and all warranties will run to the
Association.

(h) all work to be completed by Seller shall
be completed in a good and workmanlike manner
and shall be of a quality consistent with the
first floor model unit used by Seller in the
Building.

III. ANALYSIS

This matter was referred for a decision on the following
question:

Did the Declarant properly exclude the
implied warranties and/or express warranties?

The plaintiff Association contends that the defendants
warranted the condition of every building component and system,
by virtue of the warranty provisions provided in the Connecticut
New Homes Warranties Act ("NHWA"), Conn. Gen. Stat. §§47-116 et
seq., and the Common Interest Ownership Act ("CIOA"), Conn. Gen.
Stat. §§47-200 et seq.  See Association's Master Punch List
Memorandum, Pl. Ex. BB.  Plaintiff argues that defendants failed
to properly exclude the implied warranties and/or express

20

warranties under the NHWA and CIOA.  Defendants argue that "no
express warranties were created with respect to the building
systems and components complained about and that, in addition,
they have excluded and/or disclaimed the implied and express
warranties . . . ." [Doc. #34 at 19].


<u>Does the NHWA apply? No.</u>

The Court finds that the Association and subsequent
purchasers do not meet the statutory definition of "purchaser"
under §47-116.

<u>NHWA §47-116 "Vendor"</u>

Under §47-116 of the NHWA, express warranties pursuant to
§47-117 can only be created by a "vendor" and only run to a
"purchaser."  Defendants argue "only Brookside Elm fits within
the definition of "vendor" as set forth in §47-116."[6] [Doc. #34
at 20]. They contend that "Collins Enterprises acted as
construction manager only during the initial renovation phase
dealing with cosmetic improvements, and not during the renovation
work with which the plaintiff takes issue." <u>Id.</u>  While plaintiff
argues that this argument is "not relevant to the issue of the

_____

[6]A "vendor" is defined as

        any person engaged in the business of
        erecting or creating an improvement on real
        estate, any declarant of a conversion
        condominium, or any person to whom a
        completed improvement has been granted for
        resale in the course of his business.

Conn. Gen. Stat. §47-116.

effectiveness of the disclaimers" [Doc. #38 at 22], plaintiff asserts that "Mr. Collins, along with his three alter ego entities, were continually active and controlling parties with respect to the Declarant (and precisely fit the definition of an "affiliate of a declarant," . . . [and] are jointly and severally liable with the Declarant with regard to the Association's tort claims arising from the breaches of the [implied warranties] and [express warranties] under both Acts." [Doc. #38 at 23-24]. Whether all of the defendants are "vendors" raises a question of fact that is not currently before the Court.

### NHWA §47-116 "Purchaser"

Under §47-116 of the NHWA, "purchaser" is defined as "the original buyer, his heirs or designated representatives of any improved real estate . . . ."  Defendants correctly assert that the Association is not a "purchaser" under the NHWA and thus "has no independent warranty rights under this Act."  Defendants represent that "[a]t least 10 of the original purchasers have sold their units . . . [and] subsequent unit owners are not "purchasers" under the Act and cannot claim the benefit of any warranty under the Act." [Doc. #34 at 21].  While claiming that this argument is also not relevant to the issue before the Court, plaintiff does not address whether the Association is a "purchaser" under the NHWA and does not address the application of the NHWA to subsequent buyers.   [Doc. #38 at 18-19, 21-22].

Under Conn. Gen. Stat. §47-117, express warranties run from

22

the "vendor" to the "purchaser." "Vendor" is defined to mean the declarant of the conversion condominium and "purchaser" means the original buyer, his heirs, or designated representatives.  Conn. Gen. Stat. §47-116.  Under §47-274(c), "[a]ny conveyance of a unit transfers to the purchaser all express warranties of quality made by previous sellers only to the extent such a conveyance would transfer warranties pursuant to Chapter 827" [Conn. Gen. Stat. §47-116, et seq.].  Under §47-119 of Chapter 827, warranties are not transferred to subsequent purchasers except in the case of a vendor conveying an improvement to an intermediate purchaser to evade the provisions of the NHWA, a situation not applicable here.  Conn. Gen. Stat. §47-119.

There is no case law addressing this issue and the legislative history provides no guidance.[7]  Moreover, the NHWA does not have a statutory provision defining "Association", as does the CIOA at Section 47-244(a)(4).  See Starfish Condominium Assoc. v. Yorkridge Service Corp., Inc., 295 Md. 693, 702-03 (Md.

_____

[7]Connecticut's legislative history indicates that the New Homes Warranty Act statute was based on Maryland's Real Property Act Title 10 Sales of Property. Connecticut General Assembly House Proceedings 1975, Vol. 18, Part 10, p. 114 (remarks of Rep. Burke).  According to Maryland Real Property Section 10-201, "Purchaser" means the original purchaser of improved realty, and the heirs and personal representatives of the original purchaser."  Maryland's Section 10-240(c) specifically states that "[t]he warranties provided under this section do not expire on the subsequent sale of a dwelling by the original purchaser to a subsequent purchaser, but continue to protect the subsequent purchaser until the warranties provided under subsection (b) of this section expires."  While Maryland's Section 10-240(c) was available for consideration, Connecticut did not adopt the language set forth in Maryland's Section 10-240(c) when drafting the NHWA.

App. 1983) (holding "each of the original purchasers of
condominium units from the Joint Venture obtained from the Joint
Venture the implied warranties as described in [Maryland's Real
Property Code] §10-203(a), on that particular unit" and that the
condominium association had standing to sue over common elements
on behalf of the unit owner under §11-109(d)(4)).[8]

Accordingly, the Court finds that the Association and any
subsequent buyers are not "purchasers" as defined under §47-116
of the NHWA.  Scott v. Regency Dev., Inc., No. 417639, 2000 WL
1781846, *3 (Conn. Super. Ct. Nov. 8, 2000) ("By its terms, the
[NHWA] applies in situations where the vendor constructs the
improvement on real estate owned directly or indirectly by the
vendor and subsequently conveys the improved real estate to the
purchaser.");  see Jablonsky v. Klemm, 377 N.W. 2d 560 (N.D.
1985) (affirming trial court decision apportioning damages
between the individual unit owners and denying recovery to those
subsequent owners who purchased their units with notice of the
defective retaining wall).

---

[8]Maryland's Real Property §11-109(d)(4) provides that a
council of unit owners has the power:

> (4) to sue and be sued, complain and defend,
> or intervene in litigation or administrative
> proceedings in its own name on behalf of
> itself or two or more unit owners on matters
> affecting the condominium.

Connecticut's CIOA contains a similar provision at §47-244(a)(4),
whereas the NHWA does not contain such a provision.

<u>Does the CIOA Apply? Yes.</u>

    <u>CIOA §47-244(a)(4) "Association"</u>

Section 47-244(a)(4) of the CIOA states that an Association may "[i]nstitute, defend or intervene in litigation or administrative proceedings in its own name on behalf of itself or two or more unit owners on matters affecting the common interest community." Plaintiff contends that §47-244(a)(4) provides the Association with full statutory rights to represent the Unit Owners in a breach of warranty action [Doc. #38 at 18], citing, <u>Candlewood Landing Condo. Assoc., Inc. v. Town of New Milford</u>, 44 Conn. App. 107 (1997) (holding Conn. Gen. Stat. §47-244(a)(4) includes right of Association to take tax appeals on behalf of unit owners); and <u>Caswell Cove Condo. Assoc., Inc. v. Milford Partners, Inc.</u>, 58 Conn. App. 217 (2000) (condominium association has standing to bring quiet title action against land development company).  Clearly, §47-244(a)(4) of the CIOA does not confer independent express warranty rights under the CIOA on the Association, as express warranties do not run to the Association, Conn. Gen. Stat. §§47-117, 47-274(a).  Nevertheless, "§47-244(a)(4) contains no limitations on a condominium association's authority to act on behalf of the unit owners as long as at least two unit owners agree . . . a condominium may act in litigation and administrative proceedings."  <u>Candlewood Landing Condo. Assoc. Inc.</u>, 44 Conn. App. at 111; <u>Caswell Cove Condo. Assoc. Inc.</u>, 58 Conn. App. at 224 (Section 47-244(a)(4) "contains no exceptions or limitations on a condominium association's

authority to act on behalf of the unit owners as long as at least
two unit owners agree.").

Did the Public Offering Statement Comply with Connecticut Law?
Yes.

     Connecticut law requires that, "before offering any interest
in a unit to the public, [a declarant of a common interest
community or condominium conversion] shall prepare a public
offering statement conforming to the requirements of sections 47-
264 to 47-267."[9]

     Section 47-264(a)(2) requires that a POS "shall contain or
fully and accurately disclose," among other things, "[a] general
description of the common interest community, including to the
extent known, the types, number and declarant's schedule of
commencement and completion of construction of buildings and
amenities that the declarant anticipates including in the common
interest community." Conn. Gen. Stat. §47-264(a)(2).   The POS
for Winthrop House, at paragraph 2(c), "Rehabilitation Work,"
states, in relevant part, "[a]ll repair and rehabilitation work
will be done at the sole discretion of the Declarant.   The
Declarant makes no representation as to the specific repair and
rehabilitation work to be done or as to the date of completion of
any such work." [Def. Ex. A, ¶2(c)] (emphasis added).

     Section 47-264(a)(10) also requires that a POS contain

_____

     [9]See The Common Interest Ownership Act, Part IV, entitled
"Protection of Purchasers," Conn. Gen. Stat. §47-263(a).

"[t]he terms and significant limitations of any warranties
provided by declarant, including statutory warranties and
limitations on the enforcement thereof or on damages."  Conn.
Gen. Stat. §47-264(a)(10).  The POS for Winthrop House at
paragraph 10(A) sets out the statutory warranties under the
Connecticut Common Interest Ownership Act, in full text, as
follows: (1) Section 47-274, "Express Warranties of Quality"; (2)
Section 47-275 "Implied Warranties of Quality"; (3) Section 47-
276, "Exclusion or Modification of Implied Warranties of
Quality"; (4) Section 47-277, "Statute of Limitation for
Warranties".  Paragraph 10(B) of the Winthrop House POS provides
a "second statutory warranty" from the New Home Warranties Act,
in full text, as follows: (1) Section 47-116, "Definitions"; (2)
Section 47-117, "Express Warranties"; (3) Section 47-118,
"Implied Warranties"; (4) Section 47-119, "Vendor Not to Evade by
Intermediate Transfer; and (5) "Warranties Created by Chapter 827
Additional to Any Other Warranties.


        Limitations on Warranties

    In compliance with Conn. Gen. Stat. §47-264(a)(10), the
Winthrop House POS contains a section in paragraph 10, entitled
"LIMITATIONS ON WARRANTIES," which states,

    PURSUANT TO SECTIONS 47-276(b) [exclusion or modification of
    implied warranties of quality] AND 47-118(d) [exclusion or
    modification of implied warranties] OF THE CONNECTICUT GENERAL
    STATUTES, THE DECLARANT WILL INCLUDE IN ITS PURCHASE AGREEMENT
    THE FOLLOWING PARAGRAPHS WHICH PROVIDE THAT CERTAIN OF THE
    WARRANTIES DESCRIBED ABOVE ARE EXCLUDED:

        1.  THE IMPLIED WARRANTIES OF SECTIONS 47-

27

275(b) AND 47-118(a) THAT THE IMPROVEMENTS
ARE: (1) FREE FROM FAULTY AND/OR DEFECTIVE
MATERIALS, (2) CONSTRUCTED IN ACCORDANCE WITH
APPLICABLE LAW AND ACCORDING TO SOUND
ENGINEERING AND CONSTRUCTION STANDARDS, (3)
CONSTRUCTED IN A WORKMANLIKE MANNER, AND (4)
FIT FOR HABITATION ARE EXCLUDED TO THE EXTENT
THE IMPROVEMENTS ARE COMPLETED AS OF THE DATE
OF THE PURCHASE AGREEMENT.  SPECIFICALLY, THE
DECLARANT MAKES NO REPRESENTATION OR WARRANTY
WHATSOEVER WITH RESPECT TO ANY STRUCTURAL
COMPONENT OF THE BUILDING; THE EXTERIOR
FACADE OF THE BUILDING; THE ROOF; THE BOILERS
OR ANY OTHER PART OF THE HEATING SYSTEM; THE
ELECTRICAL SYSTEM, THE HOT WATER SYSTEM, OR
THE PLUMBING SYSTEM OR ANY PART OF ANY SUCH
SYSTEMS; OR WITH RESPECT TO ANY KITCHEN
CABINETS, CARPETING, TILING, WALLPAPER, PAINT
OR OTHER SURFACE FINISHINGS OF ANY KIND,
WOODWORK, BATHROOM FIXTURES, OR UTILITY
FIXTURES OR OUTLETS.

2.  THE DECLARANT MAKES NO WARRANTIES AS TO
THE CONDITION OF ANY HOT WATER HEATER, AIR
CONDITIONER, KITCHEN EQUIPMENT OR APPLIANCES
OR OTHER ITEMS CONSIDERED CONSUMER PRODUCTS
UNDER THE MAGNUSEN-MOSS FEDERAL TRADE
COMMISSION ACT.  THE DECLARANT WILL DELIVER
TO BUYER ANY MANUFACTURER'S WARRANTIES THAT
ARE BOTH APPLICABLE TO SUCH EQUIPMENT OR
APPLIANCES AND FOR THE SOLE BENEFIT OF THE
CONSUMER PURCHASER.  IMPROVEMENTS AND
APPLIANCES INSTALLED BY DECLARANT AT A
PURCHASER'S REQUEST AND EXPENSE, IF ANY,
SHALL BE COVERED BY THE MANUFACTURER'S OR
CONTRACTOR'S WARRANTY, IF ANY.

3.  THE DECLARANT MAKES NO REPRESENTATIONS OR
WARRANTIES AS TO THE CONDITION OR HEALTH OF
ANY SHRUBS, TREES OR PLANTINGS LOCATED ON THE
AREAS SURROUNDING THE BUILDINGS.  THE
DECLARANT WILL DELIVER TO THE ASSOCIATION ANY
NURSERY'S WARRANTIES THAT ARE BOTH APPLICABLE
TO SUCH VEGETATION AND FOR THE SOLE BENEFIT
OF THE CONDOMINIUM ASSOCIATION.

4.  THE PURCHASER ACKNOWLEDGES BY SIGNING
THIS PURCHASE AGREEMENT THAT THE PURCHASER
AGREES TO AND UNDERSTANDS THE AGREED TO AS
PART OF THE BASIS OF THE PURCHASER'S BARGAIN
IN PURCHASING THE UNIT.

NO ADDITIONAL EXPRESS OR IMPLIED WARRANTIES, UNLESS REQUIRED BY LAW, ARE MADE BY THE DECLARANT.

[Def. Ex. A, POS ¶10B].


Architect/Engineering Survey

When the community interest ownership involves a building conversion, such as Winthrop House, Connecticut law sets additional requirements for the POS. Conn. Gen. Stat. Section 47-267(a) provides,

> The public offering statement of a common interest community containing any conversion building shall contain, in addition to the information required by section 47-264: (1) A statement by the declarant, incorporating a report prepared by a registered architect or engineer, describing the present condition of all structural components and mechanical and electrical installations material to the use and enjoyment of the building; (2) a statement by the declarant of the approximate dates of construction, installation and major repairs, and the expected remaining useful life of each item reported on in subdivision (1) of this subsection, together with the estimated cost, in current dollars, of replacing each of the same; and (3) a list of any outstanding notices from the municipality of uncured violations of building code or other municipal regulations, together with the estimated cost of curing those violations.

The Winthrop House POS includes an Architect/Engineering Survey dated December 28, 1994, prepared for Brookside Elm by Preiss Breismeister P.C., Architects. [Def. Ex. G to the POS]. The Survey contains thirty-eight separate entries, "describing the present condition of all structural components and mechanical

29

and electrical installations material to the use and enjoyment of
the building", including the following information required by
Conn. Gen. Stat. §47-267(a): the present condition, approximate
date of construction/installation, approximate date of major
repair, remaining useful life, current cost to replace.   The
Survey estimates the total building replacement cost to be
$7,390,500.   Regarding building codes or municipal regulations,
§47-267(a)(3), the Survey states,

> Electrically, the entire building should be
> upgraded, as well as the fire alarm and smoke
> systems. There are a number of issues which
> do not meet current codes, many of which
> would be considered to be "grandfathered" and
> allowed to remain unchanged provided there
> are no renovations to these portions of the
> building.  There are certain life safety
> issues which may be required to be updated by
> code and by law (such as smoke detection).
> There are other issues which must be
> "repaired" such as the cracks, leaks, door
> operation, etc.  Other repairs will be
> required very shortly and should be made as a
> part of a preventative maintenance program -
> reroofing, plumbing traps, etc.

[POS Ex. G].


The Survey further states,

> This report is based upon the observations of the
> visible apparent condition of the building and its
> major components on the date of inspection.
> Preiss Breismeister P.C. Architects makes no
> representation regarding latent or concealed
> defects which may exist and no warranty or
> guarantee is expressed or implied. . . .

[POS Ex. G].

<u>    The Purchase Agreement</u>

The Purchase Agreement at paragraph 12, <u>Limited Warranties</u>, states in relevant part,

> Portions of the Unit, Common Elements and Limited Common Elements have already been completed.  Buyer has inspected those portions to the extent desired by Buyer and agrees to accept them, "as is," in their existing condition subject to normal wear and tear between now and the time of Closing.
>
> Seller makes no warranties except those specifically required under Sections 75 through 78 of the Act, Conn. Gen. Stat. Section 47-274-Section 47-277, if any, as more fully described and limited in the Limited Warranty Administration Program set forth in the Public Offering Statement at Exhibit H.  THESE WARRANTIES ARE LIMITED TO THE DURATION SET FORTH IN THE STATUTE . . . All implied warranties are hereby disclaimed and excluded with respect to defects which exceed the specific standards of the Limited Warranty Administration Program, (the "Warranty Standards"), and Buyer consents to the exclusion of implied warranties exceeding said specific standards from whatever source. Buyer agrees that the price paid contemplates this exclusion.

The Purchase Agreement at paragraph 24, <u>Acknowledgments</u>, states in relevant part,

> Buyer acknowledges that he has read this Agreement and that he understands its terms. Buyer further acknowledges that prior to the date hereof Buyer received a copy of the Public Offering Statement for Winthrop House, including the Declaration and the Bylaws. This Agreement, together with any exhibits attached hereto or to the Public Offering Statement, contains the entire Agreement of the parties and no oral representations or statements, whether by the Broker, its agents or employees, or otherwise, shall be considered binding upon either of the parties.  Except as otherwise specifically

31

> provided herein, this Agreement shall not be
> terminated, modified or waived except by a
> writing signed by both parties . . . .

The Purchase Agreement at paragraph 17, Important, states in

relevant part,

> RECEIPT OF A COPY OF THE PUBLIC OFFERING
> STATEMENT FOR WINTHROP HOUSE NOT LATER THAN
> THE DATE SET FORTH ABOVE IS HEREBY
> ACKNOWLEDGED, AND BUYER UNDERSTANDS THAT THE
> STATEMENT SHOULD BE EXAMINED.
>
> . . . .
>
> IN THE EVENT THAT BUYER FAILS TO CANCEL THIS
> AGREEMENT, IT SHALL BE ACKNOWLEDGED THAT
> BUYER IS RELYING ON THE DISCLOSURES,
> DESCRIPTIONS, AND REPRESENTATIONS MADE IN THE
> PUBLIC OFFERING STATEMENT AND THIS AGREEMENT
> AS THE BASIS FOR THIS PURCHASE, AND NOT ANY
> REPRESENTATIONS, INFERENCES OR UNDERSTANDINGS
> NOT INCLUDED IN THESE DOCUMENTS.

[Pl. Ex. DD; Def. Ex. D, §Y].

The Court finds, and the parties do not dispute, that the

Winthrop House POS complied with the requirements of Conn. Gen.

Stat. §§47-263 (preparation of public offering statement.

Liability); 47-264 (public offering statement. General provisions

and requirements); and 47-267 (requirements for public offering

statement when community contains conversion building).  The

warranty provision contained in paragraph 10 of the POS listed

the statutory warranties available to each buyer under the NHWA

and CIOA.  The limitations on warranties,  set forth in capital

letters, specify the statutory warranties that are excluded,

stating, "the declarant makes no representation or warranty

whatsoever with respect to any structural component of the

building." [POS ¶10].  Declarant also stated there were no

warranties as to several specific improvements and systems. Finally, declarant complied with the statutory requirement of section 47-267, requiring that the POS for a conversion condominium contain a statement by an architect or engineer describing the present condition of all the structural components and mechanical and electrical installations, major repairs, expected remaining useful life of each item reported, and estimated cost for replacement. The Architect/Engineering Report served a second purpose, informing the buyer of the condition of the building based on a visual inspection of nearly all the systems about which the plaintiff is now complaining. See Pl. Ex. BB Master Punchlist. In addition to receiving the Architect/Engineering Report, each prospective buyer was free to conduct his own inspection. The plain language of section 47-118(b) warns that no implied warranties shall "apply to any condition that an inspection of the premises would reveal to a reasonably diligent purchaser at the time the contract is signed." Plaintiff, at a minimum, was on notice of the defects listed in the Report. Conn. Gen. Stat. §47-118(b) ("Implied Warranties").

<u>Were Express Warranties Created? Yes.</u>

Yes, as to the eleven improvements in the Preiss-Breismeister letter and the building plans only.

1.   <u>The New York Supplement</u>

The Association asserts that express warranties were created

by declarant in the Preiss Breismeister Letter[10] dated November 14, 1995, and the Architect's Certification and Sponsor's Certification that were appended to the New York Supplement Offering Plan. [Doc. #33 at 13; Pl. Ex. F].

    a. <u>Preiss Breismeister Letter</u>

       <u>"Special Risks"</u>

Plaintiff relies on the following passage in paragraph one of the Preiss Breismeister Letter as the first confirmation of express warranties. [Doc. #33 at 14].

> As part of the renovation of Winthrop House . . . we will be making many repairs and upgrades to the building. This work will eliminate any "Special Risks" as defined for the New York State Offering Plan.[11]

---

[10]This document is also referred to by plaintiff as the "Remediation Guaranty." Defendants strongly disagree that the unsigned Preiss Breismeister letter, dated November 14, 1995, is a "remediation guaranty." [Doc. #37 at 13-14].

[11]"Special risks" are defined in the Martin Act regulations, 20 NYCRR §20.3(c), as follows:

> (c) Special risks. This section, if applicable, must be on a separate page following the table of contents. All features of a plan which involve significant risk or are reasonably likely to affect disproportionately or unusually the common charges or obligations of unit owners in future years of condominium operation must be conspicuously disclosed and highlighted. A brief description of the nature of the risk should be given in this section and a more thorough description should be given in a referenced later section. Uncertainties as to whether a risk should be described in this section would be resolved in favor or inclusion.

Plaintiff argues that, because the "Special Risks" section of the N.Y. Supplement makes no reference to any remedial work to be done by the Association with regard to the defects, then "all remedial work detailed [in the Preiss Breismeister letter] would be undertaken by [Brookside Elm Association]." [Doc. #33 at 15].

Paragraph 5 Improvements

Plaintiff relies on the following passage in paragraph five of the Preiss Breismeister Letter as the second confirmation of express warranties. [Doc. #33 at 15].

> The Sponsor <u>will</u> make the following improvements to correct defects noted in the [11/14/95] Architect's/Engineer's Report.

(Emphasis added).

The Letter further states, "the work <u>will</u> include but is not limited to" the: basement floor (¶1), exterior wall brickwork (¶2), balconies (¶3), roof (¶4), plumbing (¶5), electric (¶6), elevator (¶7), heating (¶8), garage (¶9), doors and frames (¶10), and safety and alarm systems (¶11). [Pl. Ex. F] (Emphasis added).

Defendants assert that "[m]uch of the work described in the [letter] was, in fact, performed and in many instances work exceeding that described in the [letter] was completed." [Doc. #34 at 39-40].


b.  Architect's Certification

Plaintiff contends that express warranties were also confirmed in the Architect's Certification, dated December 27, 1995, appended to the N.Y. Supplement and required under 13 NYCRR

35

§20.4. [Pl. Ex. C]. Plaintiff relies on the following
paragraphs:

>We certify that the report based on our
>visual inspection:
>
>(iv) does not contain any untrue statement or
>a material fact.
>
>(v) does not contain any fraud, deception,
>concealment, or suppression.
>
>(vi) does not contain any promise or
>representation as to the future which is
>beyond reasonable expectation or unwarranted
>by existing circumstances.

[Pl. Ex. C].

The certificate also contains a statement, not relied on by
plaintiff, that "[w]e certify that the report and all documents
prepared by us disclose all the material facts which were then
discernable for a visual inspection of the property." [Pl. Ex.
C]. The architects also stated that "it is to be understood that
all aspects of the physical property cannot be determined by a
visual inspection and that all statements contained in the
certification are premised on and limited to such visual
inspection" and that "[t]his statement is not intended as a
guaranty or warranty of the physical condition of the property."
Id.

c. Declarant's Certification

Finally, plaintiff locates a fourth confirmation of the
creation of express warranties in the Declarant's Certification

36

appended to the New York Supplement. [Pl. Ex. A].  Plaintiff

relies on the following passages in support of its argument.

> We jointly and severally certify that the
> Offering Plan does, and that documents
> submitted hereafter by us which amend or
> supplement the Offering Plan will:
>
> (4) not contain any untrue statement of
> material fact;
> . . . .
> (6) not contain any promise or representation
> as to the future which is beyond reasonable
> expectation or unwarranted by existing
> circumstances;
> . . . .
> This certification is made under penalty of
> perjury for the benefit of all persons to
> whom this offer is made.

[Pl. Ex. A].

Express warranties may be created by a written affirmation

of fact or promise; by a written description of the improvement,

including plans and specifications; or by sample or modes, all as

provided in §47-274. Brookside Elm states that the Letter "lists

11 areas of improvements the writer indicated would be made."

[Doc. #34 at 15].  The Court finds that the affirmative language

"will" followed by a list of eleven items to be worked on created

express warranties under the CIOA §47-274(a)(2).

Defendants point out that the N.Y. Supplement specifically

states that it was "not directed to, nor shall it create, any

rights in or obligations to any other person other than a New

York purchaser." [Def. Ex. D at 8]. They argue, and the Court

agrees, that "even assuming _arguendo_ that the Press/Breismeister

[letter] . . . created certain express warranties (a position

Brookside Elm vigorously disputes) the alleged warranties would

only run to the 6 New York Purchasers." [Doc. #37 at 15].   By
its terms, any express warranties created in the N.Y. Supplement
do not run to the Association, would not run to subsequent
purchasers, and would not run to purchasers who did not receive
the N.Y. Supplement.  N.Y. Suppl. at 8.

Defendants also argue that "[t]here were no express
warranties made by Brookside Elm that Winthrop House would be
made fully compliant with all current codes, and that every
defect or every item requiring maintenance or repair work would
be repaired, replaced, or rebuilt so that the building would be
in "like-new" condition."   [Doc. #37 at 13].  The Court agrees
that the unsigned Preiss Breismeister letter dated November 14,
1995 does not create an express warranty to rebuild the building
in "like-new condition."  Defendants also assert that the Preiss
Breismeister letter is not a "Remediation Guarantee," arguing
that nowhere in the document is it referred to as a "Remediation
Guarantee," and nowhere in the document "is there any guaranty or
warranty with respect to the performance of any building system
or component." [Doc. #37 at 13].  The Court agrees that the
letter is not a remediation guarantee as plaintiff contends.
Indeed, plaintiff's Master Punch List demands a far broader scope
of remediation then what is listed in the Preiss Breismeister
Letter. That letter states that Brookside Elm "will make the
following improvements to correct defects noted in the
Architect's/Engineer Report." The Court finds no promise to
remediate defects to plaintiff's specifications as set forth in

38

the Master Punchlist, or to remediate defects to a "like new"
condition.

The Court finds that, at best, the Letter created a promise
to the six N.Y. purchasers to make "improvements to correct
defects" in the eleven items listed, the scope of which is
described by Brookside Elm in the Preiss Breismeister Letter.[12]

Finally, Brookside Elm argues "no where in the [Letter] is
there any indication that it overrides the clear, explicit, and
oft-repeated language of the POS that, while some repairs are
contemplated, Brookside Elm retains the right in its <u>sole</u>
<u>discretion</u> to determine what repair, if any, will be made and to
determine the scope of any repairs undertaken." [Doc. # 37 at 14-
15]. Defendants correctly point out that there is nothing in the
Letter to negate this language contained in the POS. [Doc. #34

---

[12]The Court is unable to determine on this record whether
Brookside Elm completed the eleven itemized improvements to
Winthrop House as detailed in the Preiss Breismeister Letter.
Nevertheless, plaintiff's Master Punchlist asserts the
remediation that it contends needs to be completed. Plaintiff
states that the work to the Garage ¶9 was completed. [Doc. #33 at
25]. Brookside Elm states "[m]uch of the work described in the
memorandum was, in fact, performed and in many instances work
exceeded that described in the [Letter] was completed." [Doc. #34
at 39-40]. Defendants state that the building received a new roof
with a twelve year warranty from the manufacturer. [Doc. #37 at
14, Pl. Ex. F. ¶4]. Defendants also correctly state that there is
no mention in the Preiss Breismeister Letter of replacing the
structural steel beams as listed by plaintiff in the Master
Punchlist. [Doc. #37 at 14, Pl. Ex. F. ¶3]. Defendants also point
out there is no mention in the Letter promising repairs or
promising to conduct various tests of the heating system or to
bring Winthrop House into compliance with all current codes as is
listed in plaintiff's Master Punchlist. [Pl. Ex. BB ¶¶9-19; ¶¶2,9
11-16, 20-25, 27, 32, 33]. Brookside Elm states it "spent in
excess of $6,100,000 on upgrades and renovations." [Doc. #34 at
40].

at 39].

The burden then shifts to defendants to show that, once they created the expectation that the eleven items listed in the Preiss Breismeister Letter would be repaired, there was a "new agreement" negating these eleven express warranties.  See Breckenridge, 616 N.E.2d at 620 ("Since the defendant is claiming waiver, it had the burden of proving at trial that the plaintiffs knew of their right to an implied warranty of habitability and that the plaintiffs knowingly waived that right.").  The Court finds under the CIOA §47-274, that defendants did not specifically disclaim these eleven improvements listed in the November 1995 letter.

Comments to the Uniform Common Interest Ownership Act ("UCIOA") provide guidance in interpreting §47-274 of Connecticut's CIOA.  Comment 2 to the UCIOA states,

> This section . . . deals with express warranties, that is, with the expectations of the purchaser created by particular conduct of the declarant in connection with inducement of the sale.  It is based on the principle that, "once it is established that the declarant has acted so as to create particular expectations in the purchaser, warranty should be found unless it is clear that, prior to the time of final agreement, the declarant has negated the conduct which created the expectation.

See Uniform Common Interest Ownership Act §4-113, Cmt. 2 (1982). Here, the Preiss Breismister letter provided a written affirmation to the N.Y. purchasers that eleven improvements would be completed. The Court finds that defendants did not specifically disclaim these eleven improvements in the form

40

required by the CIOA.

The Court does not find any express warranties created in the Architect's Certification or the Declarant's Certification, both appended to the N.Y. Supplement.

2.  Building Plans

Plaintiff argues that "[a]nother example of Declarant's ineffective disclaimers of the [express warranties] are in its Building Plans." [Doc. #38 at 13].  Pursuant to Conn. Gen. Stat. §47-274(a)(2), "[a]ny model or description of the physical characteristics of the common interest community, including plans and specifications of or for improvements, creates an express warranty that the common interest community will substantially conform to the model or description."  Conn. Gen. Stat. §47-274(a)(2).  Specifically, plaintiff cites the 7/29/94 Electrical Plans approved by the Greenwich Fire Marshal's Office. The Electrical Plans show that "G" Units of 969 square feet were to have four smoke detectors installed by defendants; however, plaintiff points out that only two smoke detectors were installed in "G" Units.[13] [Doc. #38 at 13].  Defendants offer no response to this claim.  Although plaintiff states that there exist "many" express warranties in the Building Plans, it offers no other examples.  Id.  The Court finds that the plain language of Conn. Gen. Stat. §47-274(a)(2) supports a finding that the Electrical

_____

[13]Plaintiff states there are six "G" Units at Winthrop House. [Doc. #38 at 13].

Plans created an express warranty to install four smoke detectors in the six "G" Units and that defendants have not demonstrated that they disclaimed this express warranty.

    3.   <u>The Sorrow Rider II</u>

Plaintiff contends that Brookside Elm made unconditional express warranties in the Sorrow Rider II [Doc. #33 at 17-20]. The "Sorrow Rider II" is an attachment to a purchase agreement between Brookside Elm and Jerry and Pamela Sorrow, the purchasers of Unit 55 in Winthrop House.[14] [Pl. Ex. QQ]. The Sorrow Rider II was attached only the Unit 55 purchase agreement. [Doc. #37 at 17]. A certificate of occupancy for Unit 55 was issued May 2, 1996. [Doc. #34 at 38]. The Sorrows closed on their unit on May 3, 1996, <u>Id.</u>, and have sold their unit and no longer reside at Winthrop House. [Doc. #37 at 17].

Plaintiff argues that Brookside Elm "explicitly warranted" in the Sorrow Rider II "that the subject Unit(s) and also the Building, inter alia, would be free of any Code violations and would be constructed in accordance with the customary standard of workmanlike quality." <u>Id.</u> at 17. In its reply brief, the Association contends there are twenty-seven express warranties created in the Sorrow Rider II, three express warranties for the specific benefit of the Association; and twenty-four express

---

[14]The first rider, labeled "Rider," does not appear to be at issue in the present matter.  The document labeled "Rider II" is the document relied on by plaintiff, specifically paragraphs 1, 3,4, and 7(a), (b), (d), (e) and (h). [Doc. #33 at 19].

warranties for the specific benefit of the Sorrows.[15] [Doc. #38 at 15].

Brookside Elm first argues that the Association is not a third party beneficiary of the Sorrow Rider II, as "[t]here is nothing in the purchase agreement or the rider . . . that even suggests that Brookside Elm intended that the Association could enforce the terms and conditions of, and that the Association would be bound by the terms and conditions of, the purchase agreement and rider." [Doc. #37 at 17].  The Court agrees.  The purchase agreement clearly states that the terms of the Agreement apply to the parties to the Agreement, namely Brookside Elm and the Sorrows.

The only sections of Rider II which purport to run to the Association are paragraph 7, sections (a), (b) and (e), which state that specific warranties, if any, "shall run to the Association."  The Association relies on language contained in paragraph 7 that provides any roof warranty provided by a roof company shall run to the Association [¶7(a)]; any warranty for repointing and repair of the exterior of the building shall run to the Association [¶7(b)]; and any and all warranties for repairs relating to the central boiler and heating system shall run to the Association [¶7(e)].  It is undisputed that a twelve-

---

[15]The Association assert that twelve of the twenty-four express warranties "were with respect to the Common Elements, to the de facto benefit of all Purchasers and the Association, because the Declarant obviously could not repair for example the leveling function of the Elevator, as required in the Sorrow Rider, at Paragraph 7(c), so that it leveled properly only when the Sorrows used the Elevator)." [Doc. #38 at 15].

year warranty was provided to the Association by GS Roofing
Products Company Inc. [Def. Ex. F]. Brookside Elm correctly
states that the paragraphs 7(b) and (e) both state that the terms
of the POS dictated the scope of work to be done. Paragraph 7(b)
and (e) state that the exterior repair and boiler work were to be
completed as recommended in the POS, which "gave the declarant
the sole discretion with respect to what repairs, if any, would
be done." [Doc. #34 at 38-39]. The Association argues that, as
there is no reference in the Sorrow Rider II to defendant having
"sole discretion," then the terms of the Rider control. It cites
the introductory paragraph which states, in relevant part, "[i]n
the event that there is a conflict between the terms of the
Agreement and the terms of the Rider, the terms of the Rider
shall control . . . ." [Doc. #38 at 14-15]. The Court finds no
conflict here between the Agreement and the Sorrow Rider II, as
paragraphs 7(b) and (e) specifically reference the POS. The POS
in turn specifically provided that "[a]ll repair and
rehabilitation work will be done at the sole discretion of
[Brookside Elm]." [POS ¶2(c)]. .

Brookside Elm argues, and the Court finds, that often
"contractors performing certain work are often required to
provide a warranty for materials and/or labor for their work."
[Doc. #37 at 19]. Defendant argues that warranties, such as those
contained in ¶7(a), (b) and (e), are usually provided to "the
owner of the property, even if the contractor or subcontractor
did not contract directly with the owner for the work. In this

case, any labor or material warranties would name the
Association." [Doc. #37 at 19].  The Court agrees that the
warranties set forth in paragraph 7, sections (a), (b) and (e)
relate only to any labor or material warranties provided by
Contractors and did not confer on the Association a right of
action as a third party beneficiary against Brookside Elm.  As
the Sorrows are not Winthrop House residents, the Court finds
that the Association may not enforce the other terms of the
Sorrow Rider II.


Were Express and Implied Warranties Properly Excluded Under the
CIOA?

Express Warranties: No

    The Association argues that "[t]here is no provision in the
CIOA permitting the exclusion of a CIOA [express warranty]."
[Doc. #33 at 21].  In other words, "[express warranties] simply
cannot be disclaimed under CIOA."  Id.

    Defendants do not address this argument or offer any case
law. Rather, they argue that "no express warranties for the
conditions at issue were created." [Doc. #34 at 32]. Defendants
argue that the POS and N.Y. Supplement "described in detail the
present condition of Winthrop House . . . [and] "repeatedly
advised prospective purchasers that any repair or rehabilitation
work would be done at the sole discretion of the declarant . . .
. Purchasers, thus, had no reasonable expectation the declarant
was guaranteeing that any specific rehabilitation work would be

45

undertaken." [Doc. #34 at 32]._____

The Court finds that express warranties cannot be excluded under the CIOA. As set forth above, the Court finds that certain express warranties were created.

First, the Preiss Breismeister Letter created a promise to the six New York purchasers to make "improvements to correct defects" in the eleven listed items. Express warranties created in the N.Y. Supplement do not run to the Association, or subsequent purchasers and do not run to a purchaser who did not receive the N.Y. Supplement.[16]

Second, the Electrical Plans created an express warranty to install four smoke detectors in the six "G" Units and that defendants have not demonstrated that they disclaimed this express warranty.


Implied Warranties: Yes

Implied warranties may be excluded or modified under the CIOA, §47-276, "by agreement of the parties."[17]

---

[16]The Court notes that at oral argument defendants argued that most of the work had been done. Defendants contend that plaintiff's chief complaint was that it was unhappy with the quality of the completed work.

[17]§47-276, Exclusion or modification of implied warranties of quality, states

(a) Except as limited by subsection (b) of this section with respect to a purchaser of a unit that may be used for residential use, implied warranties of quality: (1) May be excluded or modified by agreement of the parties; and (2) are excluded by expression of disclaimer, such as "as is", "with all faults", or other language that in common understanding calls the purchaser's attention to the

The Association argues that CIOA §47-276(b) has "very detailed requirements which must be strictly met by a declarant." [Doc. #38 at 3].  It urges that the Declarant "is unable to specifically point to any document (or set of documents) which, statutory subsection by statutory subsection, satisfies the explicit and very detailed requirements of the [CIOA]."  [Doc. #38 at 3]. As set forth above, the Court finds to the contrary. The Court has identified detailed disclaimers that satisfy the statutory requirements of §47-276 in the POS at paragraphs 2(c), 10(a), and 10(b); the Architect/Engineering Survey (POS Ex. G specifying defects or classes of defects), and the Purchase Agreement at paragraphs 12, 24, and 17. The buyers acknowledged in writing their acceptance and understanding of these terms, and that these terms became part of the basis of the bargain.

In its briefs, plaintiff disregarded entirely paragraph 10 of the POS, in favor of characterizing as "[t]ypical of the Declarant's ineffective language" the expansive disclaimer language contained in paragraph 12 of the Purchase Agreement with

---

exclusion of warranties.

(b) With respect to a purchaser of a unit that may be occupied for residential use, no general disclaimer of implied warranties of quality is effective, but a declarant may disclaim liability in an instrument signed by the purchaser for a specified defect or class of defects or specified failure to comply with applicable law, if the defect or failure entered into and became a part of the basis of the bargain.

the New York purchasers, stating in part, "[a]ll implied warranties are hereby disclaimed and excluded . . . ." [Doc. #38 at 4].  Plaintiff argues that this language "is precisely the conclusory, one-line type language that the Appellate Court found in Cafro v. Brophy, 62 Conn. App. 113, 123 (2001), to be so fatally defective "that it warrants no further discussion.""[18] Id. at 4-5. This case is readily distinguishable from Cafro. Where the one-line disclaimer in Cafro was found only in the sales agreement, here the warranty disclaimers are contained in the public offering statements, the Architect/Engineering Survey and limited warranty forms, as well as in the purchase agreements. Cafro involved new home construction, while Winthrop House involved a condominium conversion where the condition of the building was fully disclosed to prospective buyers. The Cafro disclaimer was contained in one sentence and did not set forth the same detail provided in the Winthrop House documents; for example, the POS details the various building systems and components for which no express or implied warranties are given. Moreover, plaintiff selectively cites a sentence from the Purchase Agreements provided to New York purchasers that does not apply to all the unit owners and seemingly ignores all of the

---

[18]In Cafro v. Brophy, 62 Conn. App. 113, 116 (2001), a case on which plaintiff heavily relied on, the warranty disclaimer at issue was contained in paragraph five of the parties' sales agreement.  "Paragraph five of their agreement stated that the buyer accepts home without any warranty express or implied except for the following: seller shall warranty for a period of one year, the structural integrity of [the] residence and that the major mechanical systems are operational."  Id.

other documents provided to the owners.

State courts outside Connecticut considering warranty disclaimers have recognized valid waivers of warranty provisions in similar circumstances. Alexander v. Henderson Condo. Assoc., Inc., 778 So.2d 627 (La. Ct. App.  2002), involved a sale of a unit in condominium conversion. In granting summary judgment, the Court found

> [t]he waiver of warranty is clear, explicit and strongly worded.  The waiver of warranty expressly limits any warranty to the appliances, and provides that the unit is sold "as is", without any warranty whatsoever, either express or implied, including but not limited to, any such warranties with respect to fitness for intended purpose or any such warranties against vices and defect, even hidden or latent defects that could not be discovered by inspection.[19]

Id. at 629 (emphasis added).

In affirming summary judgment, the New York Court of Appeals in Fumarelli v. Marsam Dev., Inc., 92 N.Y.2d 298, 307 (1998), found that the limited warranty, "express or implied," contained in the purchase agreement demonstrated that the parties "agreed to exclude all warranties other than those expressly agreed to

---

[19]The waiver of warranty at issue in Alexander was printed in all capital letters and stated that the unit was conveyed "AS IS, WITHOUT ANY WARRANTY WHATSOEVER, EITHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO, ANY SUCH WARRANTIES WITH RESPECT TO FITNESS FOR INTENDED PURPOSE OR ANY SUCH WARRANTIES AGAINST VICES AND DEFECTS EVEN HIDDEN OR LATENT DEFECTS THAT COULD NOT BE DISCOVERED BY AN INSPECTION." The Louisiana Appellate Court found the waiver of warranty was "clear, explicit and strongly worded." 778 So. 2d at 629 (emphasis added).

within their purchase agreement."[20]  Hughes v. Potter Homes,
Inc., No. CL99-242, 2000 WL 1672922, *2 (Va. Cir. Ct. Oct. 27,
2000) held "it is obvious that [the parties] intended to waive or
exclude all warranties ["either express or implied"] from this
sale . . . ." "The words are conspicuously set forth, they are in
capital letter, they are at least two points larger than the
other type, and they specify with adequate particularity the
warranties being waived."[21]  See Hirshorn v. Little Lake Estates,
Inc., 674 N.Y.S.2d 109 (N.Y. App. Div. 1998) (Among several

---

[20]The purchase agreement in Fumarelli contained the
following provision,

> THE SPONSOR MAKES NO HOUSING MERCHANT IMPLIED
> WARRANTY OR ANY OTHER WARRANTIES, EXPRESS OR
> IMPLIED, IN CONNECTION WITH THIS PURCHASE
> AGREEMENT OR THE UNIT, AND ALL SUCH
> WARRANTIES ARE EXCLUDED, EXCEPT AS PROVIDED
> IN THE LIMITED WARRANTY ANNEXED TO THIS
> PURCHASE AGREEMENT.  THE EXPRESS TERMS OF THE
> ANNEXED LIMITED WARRANTY ARE HEREBY
> INCORPORATED IN AND MADE A PART OF THIS
> PURCHASE AGREEMENT; THEY SHALL SURVIVE THE
> CLOSING OF TITLE; AND THERE ARE NO OTHER
> WARRANTIES WHICH EXTEND BEYOND THE FACE
> THEREOF.

92 N.Y. 2d at 301 (emphasis added).

[21]The parties' preprinted contract contained the following
warranty provision:

> 11.  WARRANTIES. (a) PURCHASER acknowledges
> he has been afforded the opportunity to
> review the written builder's limited warranty
> prior to execution of this AGREEMENT, and
> agrees to accept this warranty as the sole
> warranty of the SELLER, IN SO ACCEPTING,
> PURCHASER HEREBY WAIVES ALL OTHER WARRANTIES,
> EITHER EXPRESSED OR IMPLIED, INCLUDING THOSE
> PROVIDED IN SECTION 55-70.1 OF THE CODE OF
> VIRGINIA CONCERNING STRUCTURAL DEFECTS,
> WORKMANLIKE CONSTRUCTION AND HABITABILITY.

riders to the contract was a limited warranty which excluded all other warranties. The Court found that "the limited warranty, which limited the defendants' liability to "the cost of reasonable repairs by the seller or his designee" and excluded "any and all other warranties, express or implied," complied with General Business Law 777-b.") (emphasis added); Smith v. Randolph Williams, Inc., No. 110267, 1994 WL 1031188, *9 n. 10, *10 (Va. Cir. Ct. May 13, 1994) (Court found the language of the Limited Home Warranty Agreement "clear and unambiguous"; the Court further upheld the waiver of warranties contained in the Sales Agreement); Breckenridge v. Cambridge Homes, Inc., 616 N.E.2d 615, 620 (Ill. App. Ct. 1993) ("evidence showed that the disclaimer language was brought to [buyers] attention, that the consequences of agreement were made known to them, and that they knowingly waived their rights to pursue an action against defendant for any alleged breach of the implied warranty of habitability."); Rosenblum v. Santa Fe Dev. Corp., No. 108764, 1992 WL 884974, *2 (Va. Cir. Ct. Oct. 20, 1992) (finding the waiver of statutory warranties in the Agreement of Sale and the language in the Limited Home Warranty Agreement "clearly prevent plaintiffs from bringing suit . . . .").

Other state courts have imposed a "heavy burden" of proof when considering limitations/disclaimers of implied warranties. In Crowder v. Vandendeale, the Missouri Supreme Court held that the burden of proving that a bargain intended to vary implied warranties was great.

> [O]ne seeking the benefit of such a
> disclaimer must not only show a conspicuous
> provision which fully discloses the
> consequences of its inclusion but also that
> such was in fact the agreement reached.  The
> heavy burden thus placed upon the builder is
> completely justified, for by his assertion of
> the disclaimer he is seeking to show that the
> buyer has relinquished protection afforded
> him by public policy. A knowing waiver of
> this protection will not be readily implied.

564 S.W.2d 879, 881, n.4 (Mo. 1978)(en banc). In demonstrating
"the fact of the bargain" to vary  implied warranty terms, the
Crowder court added, "boilerplate clauses, however worded, are
rendered ineffective, thereby affording the consumer the desired
protection without denying enforcement of what is in fact the
intention of the parties." Id. at 881. See Crawford v.
Whittaker Constr., Inc., 772 S.W.2d 819, 822 (Mo. App. E.D.
1989)(applying Crowder, the Court held that "[o]ne asserting a
disclaimer of the warranties implied by public policy in a new
home purchase must establish that such protections were knowingly
relinquished as a result of a bargain in fact, i.e. an agreement
reached through discussion and negotiation, and boilerplate
clauses in a form contract alone do not establish these
requirements."); Centex Homes v. Buecher, No. 00-0479, 2001 WL
1946128, *7 (Tex. Aug. 29, 2002) (Applying Crowder, the court
held that "only in unique circumstances, such as when a purchaser
buys a problem house with express and full knowledge of the
defects that affect its habitability, should a waiver of this
warranty be recognized."); Tusch Enter. v. Coffin, 740 P.2d
1022, 1031 (Idaho 1987) (disclaimers fell "woefully short of

fulfilling the requirements" set forth in <u>Crowder</u>.  "Clearly,
when no mention is made of the implied warranty of habitability
in a contract, and the contract contains only general language
stating there are no warranties other than those contained within
its four corners, any purported waiver of the implied warranty of
habitability is ineffective."); <u>Peterson v. Hubschman Constr.</u>
<u>Co.</u>, 389 N.E.2d 1154 (Ill. 1979) (Illinois Supreme Court adopting
<u>Crowder</u>).  <u>See also</u> <u>Board of Managers of the Village Centre</u>
<u>Condo. v. Wilmette Partners</u>, 760 N.E.2d 976, 981 (Ill. 2001)
(disclaimer was not valid because it did not refer to the implied
warranty of habitability by name.);  <u>Pontiere v. James Dinert,</u>
<u>Inc.</u>, 627 A.2d 1204, 1207 (Pa. Super. Ct. 1993) ("builder-vendor
may not exclude the implied warranty of habitability absent
"particular" language which is designed to put the buyer on
notice of the rights he is waiving."); <u>Dewberry v. Maddox</u>, 755
S.W.2d 50, 54 (Tenn. Ct. App. 1988) (Disclaimer provision stating
"Purchaser accepts Property in its existing condition, no
warranties or representations having been made by Seller or Agent
which are not expressly stated herein" is inadequate to disclaim
implied warranty.); <u>Starfish Condo. Assoc. v. Yorkridge Serv.</u>
<u>Corp. Inc.</u>, 458 A.2d 805, 810 (Md. 1983) ("As is" provision did
not satisfy statutory requirements to "[set] forth in detail the
warranty to be excluded or modified"); <u>Casavant v. Campopiano</u>,
327 A.2d 831, 834 (R.I. 1974) (Holding contract language "in the
same condition in which they now are" does not meet the standard
of specificity to exclude implied warranties.).

Based on the parties' contract language, quoted extensively above, there is no ambiguity with regard to the limitations on implied warranties here.  The text is conspicuously set forth, in capital letters, and specifies the warranties being waived. Paragraph 10 particularly refers to the statutory warranties created by Conn. Gen. Stat. §§47-275(b) (implied warranty of quality under the CIOA) as well as more generally to all "representations or warranties whatsoever." [POS ¶10]. Paragraph 10(1) specifically excludes the implied warranties provided in §47-118(a) that improvements will be: "(1) FREE FROM FAULTY AND/OR DEFECTIVE MATERIALS, (2) CONSTRUCTED IN ACCORDANCE WITH APPLICABLE LAW AND ACCORDING TO SOUND ENGINEERING AND CONSTRUCTION STANDARDS, (3) CONSTRUCTED IN A WORKMANLIKE MANNER, AND (4) FIT FOR HABITATION. To exclude or modify an implied warranty under §47-118(d), the statute requires that the parties "[set] forth in detail the warranty to be excluded or modified . . . . " "The obvious purpose of this requirement is to advise the purchaser of the rights which the statute confers and which the purchaser is asked contractually to waive." Starfish Condo. Assoc., 458 A.2d at 810 (Construing Maryland's statute, §10-203(d), ("exclusion or modification of implied warranty"), that requires parties to "[set] forth in detail the warranty to be excluded or modified . . . .").

This was not a newly constructed building.  The parties were clearly on notice that Winthrop Arms was a conversion of an apartment building built in 1938.  Here, declarant provided, as

required under Connecticut law, an Architects/Engineering Report that set forth in detail the structural problems with the property. Buyers had notice of the building's defects.[22] See Centex Homes, 2001 WL 1946128, *7 ("the implied warranty of habitability extends only to latent defects. It does not include defects, even substantial ones, that are known by or expressly disclosed to the buyer.").

This case differs significantly from the many "new home" cases reviewed by this Court, because Winthrop Arms involved the conversion of a then-56-year-old apartment building whose units declarant did not purport to convey in "as new" condition. See Kelley v. Astor Investors, Inc., 478 N.E.2d 1346 (Ill. 1985) (affirming holding that implied warranty of habitability should not be extended to a condominium-conversion when defendants had not undertaken any significant refurbishing or renovations and where the defects were not latent and did not arise out of new construction. "Plaintiffs at least knew of the defects in their own units when they purchased them and could have discovered the other defects in the common elements in an ordinarily careful inspection."); Towers Tenant Assoc. Inc. v. Towers Limited Partnership, 563 F. Supp. 566, 575 (D.C.C. 1983) (implied warranty of habitability recognized where defendants had

_____

[22]Conn. Joint Standing Committee Hearings, General Law, Pt. 1, 1975 Sess. p. 3, remarks of Representative Burke introducing Proposed House Bill 5110 entitled "An Act Concerning Implied Warranties in the Sale of New Single Family Dwellings" that implied warranties "would only apply to defects that were latent and undiscoverable by a reasonable inspection." The Bill was later codified as Conn. Gen. Stat. §§47-117 and 47-118.

undertaken extensive rehabilitative construction and the defects
the plaintiff's complained of were defects in the "new"
construction.)  The Court finds that the parties' contract here
advised the buyers of the exclusion of implied warranties and is
effective.

Based on the foregoing analysis, the Court finds that the
implied warranties were properly excluded under the CIOA, §47-
276(b).[23]  The CIOA "is largely modeled on the Uniform Common
Interest Ownership Act  ("UCIOA")," Linden Condo. Assoc., Inc. v.
McKenna, 247 Conn. 575, 584 (1999), whose comments provide
guidance in interpreting §§47-274 and 47-275 of Connecticut's
CIOA.  Ward v. TRC Realty Corp., No. CV-89-0357578, 1992 WL
172142, *8-9 (Conn. Super. Ct. July 14, 1992).

Comment 4 to §4-115 of the UCIOA states,

> general disclaimers of implied warranties are not
> permitted with respect to purchasers of residential
> units.  However, a declarant may disclaim liability for
> a specified defect or a specified failure to comply
> with applicable law in an instrument signed by such a
> purchaser.  The requirement that the disclaimer as to
> each defect or failure be in a signed instrument is
> designed to insure that the declarant sufficiently
> calls each defect or failure to the purchaser's
> attention and that the purchaser has the opportunity to

_____

[23]Section 47-276(b) of the CIOA states,

> With respect to a purchaser of a unit that
> may be occupied for residential use, no
> general disclaimer of implied warranties of
> quality is effective, but a declarant may
> disclaim liability in an instrument signed by
> the purchaser for a specified defect or class
> of defects or specified failure to comply
> with applicable law, if the defect or failure
> entered into and became a part of the basis
> of the bargain.

consider the effect of the particular defect or failure
upon the bargain of the parties.  Consequently, this
section imposes a special burden upon the declarant who
desires to make a "laundry list" of defects or failures
by requiring him to emphasize each item on such a list
and make its import clear to prospective purchasers.
For example, the declarant of a conversion common
interest community might, consistent with this
subsection, disclaim certain warranties for "all
electrical wiring and fixtures in the building, the
furnace, all materials comprising or supporting the
roof, and all components of the air conditioning
system.

Uniform Common Interest Ownership Act §4-115, Cmt. 4 (1982), 7

U.L.A. 635.  As detailed above, the Court finds that the

disclaimers here exceed the detailed language recommended in the

official comments of the UCIOA.[24]

---

[24]Paragraph 10 of the POS specifically lists, "any
structural component of the building; the exterior facade of the
building; the roof; the boilers or any other part of the heating
system; the electrical system, the hot water system, or the
plumbing system or any part of any such systems; or with respect
to any kitchen cabinets, carpeting, tiling, wallpaper, paint or
other surface finishings or any kind, woodwork, bathroom
fixtures, or utility fixtures or outlets, hot water heater, air
conditioner, kitchen equipment or appliances or other items
considered consumer products . . . shrubs, trees or plantings."

IV.  CONCLUSION

In summary, the Court finds that the Association and subsequent purchasers do not meet the statutory definition of "purchaser" under §47-116 of the NHWA.  Accordingly, plaintiff may not bring a cause of action under the NHWA.

The Court finds that the Association may bring an action under the CIOA.

To the first question posed - whether the declarant properly excluded express warranties under the CIOA-the answer is no.[25]

The Court finds that Brookside Elm promised the six New York purchasers to make "improvements to correct defects" in the eleven items listed, as described in the Preiss Breismeister Letter.  These express warranties could not be excluded under the CIOA.  Any express warranties created in the N.Y. Supplement do not run to the Association or subsequent purchasers, and do not

--------

[25]The Court finds plaintiff's reliance on Emlee Equipment Leasing Corp. v. Waterbury Transmission, Inc, et al, 31 Conn. App. 455 (1993), inapposite.  Emlee involved an equipment finance lease.  The defendant argued in Emlee that several provisions of the lease were unconscionable, among them an accelerated payment clause and a disclaimer of warranty clause.  Id. at 468-472.  The equipment finance lease was governed by Article 2 of the Uniform Commercial Code ("UCC"), as adopted in Connecticut, Id. at 461 n. 5, and Article 2A of the UCC relating to leases of goods.  Id. at 466.  Applying this framework, the Emlee court found the disclaimer of warranties provision was not unconscionable.  Id. at 471-72.  The Court agrees with defendant that "[t]here is nothing in Emlee which addresses or has any bearing on an analysis of warranty disclaimers under the Connecticut Interest Ownership Act, Conn. Gen. Stat. §§47-200 et seq., or under the New Home Warranties Act, Conn. Gen. Stat. §§47-116 et seq.  This Court is unwilling to extend the analysis in Emlee, or for that matter the other equipment financing lease cases cited by plaintiff, to the issues in this case.

run to purchasers who did not receive the N.Y. Supplement.

The Court finds that the Electrical Plans created an express warranty to install four smoke detectors in the six "G" Units and that defendants have not demonstrated that they disclaimed this express warranty.

The Court finds that implied warranties were properly excluded under the CIOA.


SO ORDERED at Bridgeport this 19th day of December 2003.


/s/ Holly B. Fitzsimmons
_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE

59